**Alma E. GREELEY, Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 92–849C.

United States Court of Federal Claims.

March 17, 1994.

Peter W. Dicce, Beatty, Young, Otis & Linke, Media, PA, Atty. of Record, for plaintiff.

Thomas McLish, Commercial Litigation Branch, Civ. Div., Dept. of Justice, Washington, DC, with whom were Acting Asst. Atty. Gen. Stuart E. Schiffer, and David M. Cohen, for defendant.

## OPINION

HORN, Judge.

This case comes before the court on defendant's motion for summary judgment. The action arises from the death of Lawrence E. Greeley, a volunteer firefighter, on November 19, 1988. Plaintiff, Alma Greeley, the wife and executrix of the estate of Lawrence E. Greeley, seeks review of a determination by the Bureau of Justice Assistance ("BJA"), Office of Justice Programs, United States Department of Justice, denying survivor benefits, pursuant to the Public Safety Officers' Benefits Act ("PSOBA"), 42 U.S.C. § 3796 (1988). Plaintiff contends that the determination by the BJA to deny benefits was arbitrary and capricious because the administrative determination relied on reports which mischaracterized the findings of an autopsy performed on Mr. Greeley. Plaintiff further contends that the determination of the BJA was arbitrary and capricious because it failed to resolve existing reasonable doubts as to the circumstances of Mr. Greeley's death in his favor, pursuant to the applicable regulation, 28 C.F.R. § 32.4 (1988). Defendant asserts that the BJA determination was proper, was not arbitrary and capricious, and was supported by substantial evidence, in accordance with applicable statute and implementing regulation. The defendant requests that the decision to deny benefits be affirmed. The jurisdiction of this court is not disputed by the parties.

After careful consideration of the record and the filings submitted by the parties, the court, hereby, DENIES defendant's motion for summary judgment, and GRANTS summary judgment in favor of the plaintiff.

## FACTS

The following facts are undisputed: [1] Lawrence E. Greeley was the Volunteer Fire Chief of Longwood Fire Company in Chester County, Pennsylvania. At approximately 9:00 p.m., on November 19, 1988, Mr. Greeley responded to a call from the Longwood Garden Facility, where smoke was coming from the basement. Mr. Greeley entered the basement with another firefighter.[2] Once inside, they discovered a burning motor, which they turned off. The two men then proceeded to extinguish the fire and exit the basement. Mr. Greeley complained of chest pains while removing his breathing apparatus after entering the smoke-filled basement. On the way to the hospital, Mr. Greeley lost consciousness. He died at a nearby hospital at 11:22 P.M. on November 19, 1988.

Mr. Greeley's Certificate of Death and autopsy report listed the immediate cause of death as "cardiac arrthymia/arrest (clinical)." The autopsy was performed by R.A. Rogowski, M.D., Director of Laboratory Services, Southern Chester County Medical Center in West Grove, Pennsylvania. The autopsy report states, in part:

MICROSCOPIC DIAGNOSES:

HEART: Rare focal myocardial fibrosis. Moderate coronary atherosclerosis with rare calcification. [footnote added].

\* \* \* \* \* \*

HEART: The heart weighs 350 grams. The epicardial surface contains a few fatty deposits. Dissection is then carried out in the usual fashion uncovering patent mitral

---

1. The court notes the disorganized state of the appendix relied on by both parties and filed by defendant, together with defendant's motion for summary judgment. Not only did defendant fail to comply with Rule 83.1(a)(1)(G) of the United States Court of Federal Claims by failing to provide an index to the appendix, but the appendix contained the relevant administrative documents and correspondence in random order, making use of the appendix difficult.

2. Defendant set forth in its statement of facts that Chief Greeley was wearing a mask and respirator when he entered the basement. Plaintiff has countered that "it has not been conclusively determined that Chief Greeley was wearing a mask."

and aortic valve orifices. Additionally, the mitral and aortic valve leaflets appear to have been functional. The aortic rim shows no unusual sclerosis nor calcification. Sections through the myocardium fail to reveal recent or old infarctions. There is no gross evidence of fibrosis.

The major coronary arteries are in their usual anatomic places and upon longitudinal and cross sections display no evidence of thrombosis nor occlusion. Very few, slightly raised, yellowish, atherosclerotic plaques are noted. There is no evidence of calcification.

VESSELS: None of the major vessels in this body reveal evidence of thromboembolic phenomena. The aorta is straight and the intima reveals only scattered, slightly raised, atherosclerotic plaques.

Toxicology tests performed in conjunction with the autopsy showed "therapeutic" levels of the depressant diazepam (valium) and its metabolite (nordiazapam). The toxicology findings further showed that the valium probably had been ingested within three to five hours prior to specimen collection.[3] The toxicology tests revealed no other findings of clinical significance.

In accordance with 28 C.F.R. § 32.20, plaintiff submitted a claim to the BJA seeking an award of Public Safety Officer benefits. 42 U.S.C. § 3796 (1988).[4] On August 9, 1991, the BJA issued a Public Safety Officers' Benefits Claim Act determination denying plaintiff's claim. The BJA determination concluded that Mr. Greeley's death was not covered under the PSOBA because his death was "not a direct and proximate result of a personal injury, as required by the Act, and as defined by 28 C.F.R. §§ 32.2(d), (e), and (f)."[5] The BJA agency determination found that Mr. Greeley's death was caused by "cardiac arrthymia due to atherosclerotic cardiovascular disease."

The BJA based its conclusions on the findings of Captain Glenn Wagner, Assistant Armed Forces Medical Examiner, who, at the request of the BJA, had reviewed the claim materials submitted by plaintiff. Dr. Wagner concluded that a "pre-existing heart condition initiated a fatal cardiac arrhythmia" in Mr. Greeley's heart, that "[t]here was no morphological or chemical evidence of smoke inhalation" in the body, and that "the submitted documents reflect a characteristic clinical presentation for a heart attack." Dr. Wagner was of the view that there was "no evidence of a traumatic injury as defined by PSOB regulation 30.2(f)."

Subsequent to the rejection of plaintiff's application, plaintiff was sent a letter from Dr. Daniel W. Lewis, who had received the case materials from the Argonaut Insurance Company. Based upon the documents, including hospital records, the autopsy report, an investigative agency report, an interview with Bradford Bohman, and a copy of the death certificate, Dr. Lewis found that the "[a]utopsy findings showed only mild aortic atherosclerosis and moderate coronary ath-

---

**3.** According to the physician in charge of Mr. Greeley's autopsy, Dr. Rogowski, the valium found in the toxicology tests had been administered after Mr. Greeley arrived at the hospital, in connection with treatment for displayed "seizure activity."

**4.** The statute provides, in relevant part:

In any case in which the Bureau of Justice Assistance (hereinafter in this subchapter, referred to as the "Bureau") determines under regulations issued pursuant to this subchapter, that a public safety officer has died as the direct and proximate result of a personal injury sustained in the line of duty, the Bureau shall pay a benefit of $100,000 adjusted in accordance with subsection (g) of this section as follows:

(1) if there is no surviving child of such officer, to the surviving spouse of such officer;

42 U.S.C. § 3796(a) (1988) (footnote omitted).

**5.** These regulations provide, in relevant part:
32.2 Definitions.
* * * * * *
(d) "Direct and proximate" or "proximate" means that the antecedent event is a substantial factor in the result.

(e) "Personal injury" means any traumatic injury, as well as diseases which are caused by or result from such an injury, but not occupational diseases.

(f) "Traumatic injury" means a wound or the condition of the body caused by external force, including injuries inflicted by bullets, explosives, sharp instruments, blunt objects or other physical blows, chemicals, electricity, climactic conditions, infectious diseases, radiation, and bacteria, but excluding stress and strain.
28 C.F.R. § 32.2 (1988).

erosclerosis," and ". . . no evidence of thrombosis or occlusion of the coronary arteries and only a few slightly raised yellowish atherosclerotic plaques." Dr. Lewis concluded that "[i]t is clear from the autopsy findings that he [Mr. Greeley] did not die as the result of a chronic or congenital or progressive form of heart disease." Dr. Lewis went on to state that "It seems reasonable that some external factor or trauma . . . resulted in coronary spasm sufficiently severe to . . . result in a myocardial infarction and his death." Although Dr. Lewis conceded that no external signs of the trauma were found, he, nonetheless, felt confident to conclude that the "external factor . . . consisted . . . of the combined effect of the inhalation of smoke and other irritants in the environment together with the physical effort involved plus the probable depletion of ambient oxygen associated with the smoky blaze."

Plaintiff also obtained the statement of Mark Anthony Kender, M.D., who reviewed the medical records, autopsy report, toxicology report, Mr. Greeley's death certificate, and the statements of witnesses. Based upon these documents, Dr. Kender concluded that "the autopsy findings indisputably prove that Mr. Greeley had no significant pre-existing heart disease, . . . he did not die of myocardial infarction, or 'heart attack.'" Moreover, Dr. Kender wrote that a "coronary artery spasm could not have caused Mr. Greeley's death." Dr. Kender dismissed as clinically insignificant the minimal clinical findings included in the autopsy report on the condition of the decedent's heart. Dr. Kender postulated that "[s]ince Lawrence Greeley did not suffer a myocardial infarction, and had no intrinsic heart disease, an external force, namely a smoky environment to which Chief Greeley was exposed to, caused his lethal arrhythmia." Although Dr. Kender stated that the autopsy revealed no evidence of such poisoning, he theorized that the carbon monoxide would have been cleared from Mr. Greeley's body by the pure oxygen treatment, in large quantities, he received during attempts to resuscitate him before he died.

On December 5, 1991, plaintiff requested reconsideration of the August 9, 1991 BJA denial of the claim. John C. Swain, a Hearing officer for the Public Safety Officers' Benefits Program, reviewed the case. Mr. Swain considered the statements of Dr. Kender and Dr. Lewis and the findings of Dr. Wagner. In addition, on December 30, 1991, Mr. Swain solicited another medical opinion on the Greeley case from the Office of the Armed Forces Medical Examiner. On February 26, 1992, Dr. William T. Gormley, Chief Deputy Armed Forces Medical Examiner, responded by letter and concluded that "decedent's death WAS NOT the direct and proximate result of a personal injury sustained in the line of duty" (emphasis in original), and that no reasonable doubt arises from the circumstances of Mr. Greeley's death. Dr. Gormley stated that Mr. Greeley had died of heart disease terminating in cardiac arrhythmia and myocardial infarction. According to Dr. Gormley, "[t]he autopsy report documents pre-existing coronary atherosclerosis with calcification and focal myocardial fibrosis." He further concluded that there was "no historical, clinical or anatomical evidence of smoke inhalation, carbon monoxide intoxication or other acute injury."

On May 1, 1992, Mr. Swain denied plaintiff's appeal and affirmed the decision of the agency to deny benefits. Mr. Swain's hearing determination includes the following discussion:

> The record developed during the course of this written appeal by claimant contains the conflicting opinions of four doctors, two offered by claimant's attorney (Drs. Kender and Lewis) and two offered by the Armed Forces Institute of Pathology serving the PSOB program (Drs. Wagner and Gormley). . . . The argument turns on the degree of coronary atherosclerosis present as well as the extent of calcification or fibrosis present. In the view of this Examiner this difference in degree of coronary atherosclerosis present is unpersuasive, even the presence of *mild* aortic atherosclerosis recorded in the autopsy would support the opinion that heart disease existed and reasonably led to the death of Chief Greeley. Thus the issue is whether or not a *traumatic injury* was a *substantial factor* in the death.

Both Dr. Wagner and Dr. Gormley conclude that a traumatic injury was not a factor in the death. Dr. Lewis ... concluded that there was 'some external factor of trauma' which resulted in a coronary spasm depriving the left ventricle of blood supply, leading to a myocardial infarction and death. However, he points out that there was no gross external injury (such as a blow to the chest, for example). He concludes, nonetheless, that the combined effect of the inhalation of smoke and other irritants in the environment together with the physical effort involved, plus oxygen deprivation, constituted an external factor which was just as traumatic.

Dr. Kinder [sic][6] ... similarly concludes that there was external force, the smoky environment, which caused the lethal arrhythmia. He goes on to describe the manner in which carbon monoxide poisons the blood and concludes that carbon monoxide poisoning (crucial to the validity of his explanation, he says) is not ruled out by the blood gas results, which detected no carbon monoxide.

... Taken together, I reach the conclusion that neither Dr. Kinder [sic] nor Dr. Lewis provides any physical evidence to support their position and I accept the opposing conclusion reached by Dr. Wagner and Dr. Gormley that traumatic injury was not a substantial factor in the death of Captain Greeley....

As to the issue of reasonable doubt in this case, I believe the above discussion is determinative. The only argument to be made on this subject would seem to be the possibility that oxygen provided during resuscitation efforts would have displaced carbon monoxide in Captain Greeley's blood if it were present. This argument cannot be proven, is entirely speculative, and thus does not constitute a reasonable doubt in the opinion of this Hearing Officer.

(Emphasis in original.) Mr. Swain rejected the views of plaintiff's experts, Dr. Lewis and Dr. Kender, that evidence of carbon monoxide poisoning could have been cleared from Mr. Greeley's system and that carbon monoxide poisoning was the traumatic cause of death, as too speculative. At the same time, Dr. Swain adopted the views of Dr. Wagner and Dr. Gormley that Chief Greeley died of a pre-existing heart condition, although that conclusion is not supported in the medical records. Mr. Swain summarized his position as follows: "I reach the conclusion that neither Dr. Kender nor Dr. Lewis provides any physical evidence to support their position [that carbon monoxide poisoning contributed to the death] and I accept the opposing conclusion reached by Dr. Wagner and Dr. Gormley that traumatic injury was not a factor in the death of Captain Greeley." Stated otherwise, Mr. Swain concluded that the evidence he had reviewed did not raise a reasonable doubt as to whether traumatic injury had played a substantial role in Mr. Greeley's death and, thereby, adopted the findings of Dr. Wagner and Dr. Gormley that the decedent's death was caused by pre-existing heart disease.

On May 8, 1992, plaintiff requested further review by the BJA Director pursuant to 28 C.F.R. § 32.24(i) (1988). In support of this application, plaintiff submitted the statement of R.A. Rogowski, M.D., Director of Laboratory Services at Chester County Medical Center, the physician who had performed the original autopsy. In a July 23, 1992 letter to plaintiff's attorney, Dr. Rogowski, upon review of the postmortem findings related to Mr. Greeley's death and review of the "salient features of the case of Lawrence Greeley," stated:

1. The autopsy report, CCA88–87S, performed on 11/21/88 stands as submitted on 12/22/88. Indeed, for a man of his age the decedent appears to have had a "normal" degree of atherosclerotic degeneration. There was no evidence of recent or old infarctions and the coronary arteries were, generally, patent. This testifies to the fact that decedent did not have significant pre-existing arteriosclerotic cardiovascular disease.

\* \* \* \* \* \*

4. I tend to concur with the reports of Dr. Lewis and Dr. Kender and feel that

---

**6.** The doctor referred to is Dr. Mark A. Kender, not Kinder.

the degree of arteriosclerotic cardiovascular disease found in the decedent upon autopsy examination was insufficient to adequately explain the arrhythmia and demise. Carbon monoxide poisoning was ruled out with blood gases which were drawn within a very short period of time upon arrival to the ER.... Certainly, oxygen deprivation is an important consideration as elicited by Dr. Kender.

In summary, the ultimate cause of the patient's fatal cardiac arrhythmia may never be ascertained. A number of precipitating factors have been discussed but it would seem that the decedent had no significant pre-existing heart condition or disease. Although the cause of Mr. Greeley's death may be due to any number of etiologies, occlusive arteriosclerotic cardiovascular disease of the degree found at autopsy would be insufficient to justifiably explain the demise.

The BJA director requested another opinion from the Office of the Armed Forces Medical Examiner on July 23, 1992. On August 7, 1992, in response to this inquiry, Assistant Medical Examiner Jerry D. Spencer, M.D., J.D., reported his conclusions. After reviewing the case documentation and medical reports, Dr. Spencer stated that the cause of death was "not a traumatic injury as defined by the CFR [Code of Federal Regulations]." Rather, he found that there is "no reasonable doubt that the cause of death was arteriosclerotic heart disease." Dr. Spencer also stated: "All other possible causes of death can be reasonably excluded based on the circumstances and the autopsy findings."

On August 11, 1992, Elliot A. Brown, Acting Director of the BJA, affirmed the May 1, 1992 denial of plaintiff's claim. Pursuant to the applicable regulation, Mr. Brown's decision constituted the agency's final administrative decision. The BJA final decision adopted the findings of fact and conclusions of law of the May 1, 1992 denial by hearing officer James C. Swain, and the medical findings and conclusions dated August 7, 1992, of Dr. Jerry Spencer, the Assistant Medical Examiner.

On December 15, 1992, plaintiff filed a complaint with this court, alleging that the November 21, 1988 autopsy had "ruled out chronic, congenitive or progressive heart disease and/or myocardial infarction as a cause of Decedent's death," and that the administrative denials of death benefits to Mr. Greeley, therefore, were arbitrary and capricious and in clear disregard of Dr. Rogowski's autopsy findings. Plaintiff also alleges that the administrative denials fail to conform with the "regulatory requirement mandating that any reasonable doubt arising from the circumstances of an officer's death be resolved in favor of the payment of death benefits. See 28 C.F.R. § 32.4." Plaintiff seeks "judgment in her favor and against defendant and award [of] Public Safety Officer Benefits." Defendant filed an answer on February 16, 1993, disputing plaintiff's interpretation of the autopsy findings contained in the complaint and also maintaining that plaintiff is not entitled to the relief sought. On June 15, 1993, defendant moved for summary judgment. Plaintiff responded with a brief in opposition filed July 12, 1993. On July 21, 1993, defendant filed a reply brief. Counsel for both parties have informed the court that they do not request oral argument on defendant's motion for summary judgment.

## DISCUSSION

Rule 56 of the Rules of the United States Court of Federal Claims (RUSCFC) is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.), and is similar in language and effect.[7] Both Rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RUSCFC 56(c) provides that, in order for a motion for summary judgment to be granted,

7. In general, the Rules of this court are closely patterned upon the Fed.R.Civ.P. Therefore, precedent under the Fed.R.Civ.P. is relevant to interpreting the Rules of this court, including Rule

56. See Imperial Van Lines Int'l, Inc. v. United States, 821 F.2d 634, 637 (Fed.Cir.1987); Lichtefeld–Massaro, Inc. v. United States, 17 Cl.Ct. 67, 70 (1989).

the moving party bears the burden of showing that there is no genuine issue of material fact and is entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Rust Communications Group, Inc. v. United States*, 20 Cl.Ct. 392, 394 (1990); *Lima Surgical Assoc., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States*, 20 Cl.Ct. 674, 679 (1990), *aff'd*, 944 F.2d 885 (Fed.Cir.1991). Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.; see also Lloyd's Food Prods. Inc. v. Eli's Inc.*, 987 F.2d 766, 769 (Fed.Cir.1993); *Uniq Computer Corp. v. United States*, 20 Cl.Ct. 222, 228–29 (1990).

As a general proposition, when reaching a summary judgment determination, the judge's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial or further proceedings. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. at 2510; *see, e.g., Cloutier v. United States*, 19 Cl.Ct. 326, 328 (1990), *aff'd*, 937 F.2d 622 (Fed.Cir.1991). The judge must determine whether the evidence presents a disagreement sufficient to require submission to further fact finding, or whether the evidence is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250–52, 106 S.Ct. at 2511–12. When the record could not lead a rational trier of fact to find for the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), or where the facts and the law will reasonably support only one conclusion, summary judgment is appropriate. *McDermott Int'l Inc. v. Wilander*, 498 U.S. 337, 356, 111 S.Ct. 807, 818, 112 L.Ed.2d 866 (1991).

In the above-captioned case, when considering plaintiff's challenges to the BJA determination under the PSOBA, this court is limited to review of the administrative record. *Durco v. United States*, 14 Cl.Ct. 424, 427 (1988); *see also City of Wheeling, W.Va. v. United States*, 20 Cl.Ct. 659, 666 (1990), *aff'd without opinion*, 928 F.2d 410 (Fed.Cir.1991). Moreover, the standard of review of an administrative denial of benefits under the PSOBA generally is limited to determining, "(1) whether there has been substantial compliance with the statutory and implementing regulations; (2) whether there has been any arbitrary and capricious action on the part of the Government Officials involved; and (3) whether there was substantial evidence supporting the decision." *Morrow v. United States*, 227 Ct.Cl. 290, 296, 647 F.2d 1099, 1102, *cert. denied*, 454 U.S. 940, 102 S.Ct. 475, 70 L.Ed.2d 247 (1981). Determining whether the agency officials acted improperly, based on the record, is properly reserved to "the factfinder, absent a showing of abuse of discretion or absence of substantial evidence to support his findings." *Howard v. United States*, 229 Ct.Cl. 507, 510, 1981 WL 22040 (1981). The court should not act like a "superagency" and should not make a redetermination of the merits based upon the administrative record. *See Holman v. United States*, 181 Ct.Cl. 1, 8, 383 F.2d 411, 415 (1967); *Durco v. United States*, 14 Cl.Ct. at 427–28. This court, sitting in review of the administrative action, should not disturb the administrative officer's factual determinations as long as they are supported by substantial evidence. *Durco v. United States*, 14 Cl.Ct. at 427 (citing *Holman v. United States*, 181 Ct.Cl. at 8, 383 F.2d at 415).

Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1935); *Durco v. United States*, 14 Cl.Ct. at 428. Substantial evidence "is something less than the weight of the evidence. Moreover, the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. FMC*, 383 U.S. 607, 620,

86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966); *Durco v. United States,* 14 Cl.Ct. at 428. Furthermore, to make a finding of whether the agency action was arbitrary, capricious, or otherwise not in accordance with law, "the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe,* °401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

In order to be awarded benefits, the PSO-BA requires the public safety officer to have died as a "direct and proximate result of a personal injury sustained in the line of duty." 42 U.S.C. § 3796(a). The applicable implementing regulation applies "direct and proximate" to circumstances in which "the antecedent event is a substantial factor in the result." The regulation defines "personal injury" as a "traumatic injury as well as diseases which are caused by or result from such an injury." The regulation defines "traumatic injury" as "a wound or the condition of the body caused by external force, ... including ... climatic conditions, ... but excluding stress and strain." 28 C.F.R. § 32.-2(d)–32.2(f).

▮ The applicable regulations also specify that "[t]he Bureau shall resolve any reasonable doubt arising from the circumstances of the officer's death in the favor of payment of the death benefit." 28 C.F.R. § 32.4. A plaintiff, nevertheless, bears the burden of presenting sufficient evidence to demonstrate that the asserted traumatic injury was a "substantial factor in the officer's death." *See* 42 Fed.Reg. 23,260 (1977); *Morrow v. United States,* 227 Ct.Cl. at 293, 647 F.2d at 1101; *Tafoya v. United States,* 8 Cl.Ct. 256, 261 (1985).

▮ In the instant case, therefore, the questions to be resolved are whether the undisputed facts regarding how the BJA arrived at its decision to deny Mr. Greeley death benefits demonstrate compliance with the applicable statutory and regulatory framework, whether the record contains substantial factual evidence sufficient to support the administrative denial of death benefits to Mr. Greeley, and whether the government officials acted arbitrarily or capriciously in their decision-making. *Durco v. United States,* 14 Cl.Ct. at 427–28. Although the court recognizes the limited scope of judicial record review in a case in which a plaintiff challenges an administrative determination by the BJA, the court is deeply troubled by the administrative outcome in this case. The record presented to the court is replete with disagreement among the physicians who have offered opinions regarding the cause of Mr. Greeley's death. In the instant case, the BJA's final administrative determination was based on the expert opinions of physicians from the Office of the Armed Forces Medical Examiner. Each of these physicians concluded that Mr. Greeley died from a heart attack brought on by pre-existing heart disease, rather than as a result of a "traumatic injury" suffered in the line of duty. To the contrary, each of the doctors whose statements plaintiff offers, including Dr. Rogowski, the doctor who performed the original autopsy, contends that the extent of heart disease evidenced in the medical records would not have resulted in a heart attack in the absence of external factors.

The August 1991 BJA claim determination adopted the findings of Dr. Glenn Wagner, who found no evidence of traumatic injury to Mr. Greeley, pursuant to the PSOB regulations, and who concluded that the firefighter died of pre-existing heart disease. The BJA appeals hearing officer, James Swain, accepted the conclusions of Dr. Wagner, and the later opinions of Dr. Gormley and Dr. Spencer, who reviewed the file in 1992. Dr. Gormley and Dr. Spencer concluded, in their brief comments, that traumatic injury was not a substantial factor in the death of Mr. Greeley.

The expert doctors, whose opinions plaintiff has submitted for consideration, including Dr. Rogowski who performed the autopsy, however, disagree with the military doctors and are in agreement with each other that the autopsy did not reveal pre-existing heart disease to be the cause of Mr. Greeley's death. This conclusion is particularly significant because the BJA is required by regulation to give "substantial weight to the evidence and findings of fact presented by State, local and Federal administrative and

investigative agencies," such as those offered by Dr. Rogowski, who performed the autopsy and later reviewed the case. 28 C.F.R. § 32.5 (1988).

Moreover, Dr. Lewis and Dr. Kender agree that smoke inhalation, which would qualify as a traumatic injury under the PSOB statute, was the cause of death. Dr. Lewis pointed to a combination of exertion, smoke, and oxygen depletion as the cause of death, while Dr. Kender maintained that the most likely cause of death was carbon monoxide poisoning. Although in his 1992 review of Mr. Greeley's case, Dr. Rogowski discounted the possibility of carbon monoxide poisoning because carbon monoxide was not detected in the blood gas sample drawn shortly after the victim's arrival at the emergency room, Dr. Rogowski did affirm that "oxygen deprivation is an important consideration." While clearly concluding that heart disease was not the cause of the victim's death, Dr. Rogowski stated that Mr. Greeley's death "may be due to any number of etiologies" and may never be ascertained.

This court recognizes that it should not lightly undertake to overturn an administrative decision of the BJA. Each case, however, must be decided on the individual, relevant facts presented.[8] The instant case raises serious concerns, in light of the applicable regulations, as set forth in 28 C.F.R. § 32.4, which unequivocally mandate that "[t]he Bureau shall resolve any reasonable doubt arising from the circumstances of the officer's death in favor of payment of the death benefit." Given the battle of the medical experts presented in this PSOBA case, and the apparent inability of the doctors who reviewed the case to arrive at a common conclusion after analyzing the same primary sources, especially the autopsy report and the death certificate, the plaintiff should prevail. As discussed below, the plaintiff's version of the factual basis for Mr. Greeley's death is at least as reasonable as that offered by the defendant.

To reach a proper decision, the primary source documents in the record must be carefully evaluated to determine whether the BJA officials arrived at proper conclusions, and whether these documents support the BJA determination to deny death benefits to Mr. Greeley. The Certificate of Death lists "cardiac arrhythmia and/or arrest (clinical)" as the cause of death, and does not attribute the cause of death to heart disease. The most critical evidence in this case, the autopsy report, includes the following entries:

> HEART: Rare focal myocardial fibrosis. Moderate coronary atherosclerosis with rare calcification.
>
> \*    \*    \*    \*    \*    \*
>
> HEART: ... The epicardial surface contains a few fatty deposits. Dissection is then carried out in the usual fashion uncovering patent mitral and aortic valve orifices. Additionally, the mitral and aortic valve leaflets appear to have been functional. The aortic rim shows no unusual sclerosis nor calcification. Sections through the myocardium fail to reveal recent or old infarctions. There is no gross evidence of fibrosis.
>
> The major coronary arteries are in their usual anatomic places and upon longitudinal and cross sections display no evidence of thrombosis nor occlusion. Very few, slightly raised, yellowish, atherosclerotic plaques are noted. There is no evidence of calcification.
>
> VESSELS: None of the major vessels in this body reveal evidence of thromboembolic phenomena. The aorta is straight and the intima reveals only scattered, slightly raised, atherosclerotic plaques.

Despite the clear indications in the autopsy report to the contrary, the BJA officials as-

---

8. The court notes, for example, that the instant case can be distinguished clearly from *Durco v. United States*, because the court found the affidavit of the doctor offered by the plaintiff in support of its position as "unpersuasive." *Durco v. United States*, 14 Cl.Ct. at 429. Moreover, in the *Durco* case, the victim had a history of obesity and heart disease which contravened any finding that exposure to severe weather conditions caused his death. Likewise, in *Morrow v. United States*, 227 Ct.Cl. at 295, 647 F.2d at 1102, the decedent had a definite history of chronic, progressive cardiovascular disease. Thus, the effects of the smoke inhalation were secondary and minor in comparison with the underlying chronic disorder. *Id.*

cribed the cause of death to pre-existing heart disease. The original BJA claim determination signed in August 1991 by the Claims Officer, the representative of the Office of General Counsel and the Representative of the Director of the PSOB program, is based on the review of Glenn Wagner, Captain, M.C.U.S.N., Assistant Armed Forced Medical Examiner, Armed Forces Institute of Pathology. This claim determination states that there was no evidence of traumatic injury and that the firefighter died of heart disease. The medical review by Dr. Wagner, however, appears to be severely flawed. In his August 1, 1991 report submitted to the PSOB program office, Dr. Wagner states "[a]n autopsy disclosed atherosclerotic cardiovascular disease with focal myocardial scarring and acute visceral congestion." He also states: "based on the autopsy documentation of old myocardial scarring and evidence of multivessel coronary artheroscleros, this firefighter had artherosclerotic cardiovascular disease." These medical conclusions in Dr. Wagner's report, attributed by him to information contained in the autopsy report performed on Mr. Greeley, however, are not precisely reflected in the autopsy report, are at times exaggerated and are, in part, taken out of context. The autopsy report states only "Gross Diagnosis: Heart: Moderate coronary artherosclerosis ... Microscopic Diagnosis: Heart: *Rare* focal myocardial fibrosis. Moderate coronary atherosclerosis with rare calcification" and "Gross Diagnosis: Vessels: Mild aortic atherosclerosis." (Emphasis added.) "The acute generalized visceral congestion" comment, included in Dr. Wagner's report, does not appear in the autopsy report. Thus, the initial BJA claim determination appears to have been based on incorrect medical analysis. Moreover, although the appeals hearing officer, James Swain, reasoned that any evidence of heart disease, even of "mild" aortic atherosclerosis, reasonably could have led to the death of the decedent, Dr. Rogowski, the physician who conducted the autopsy, and who had an opportunity to view the physical evidence at the time of the autopsy before he authored the autopsy report, disagrees.

The instant case is striking because the autopsy report of Chief Greeley, which the defendant acknowledges as a principal source for its decision, appears to rule out the very basis upon which the BJA officials founded their decision, that the cause of the victim's death was attributable to a prior history of heart disease. The decision by the BJA officials is not persuasive in light of the findings of the autopsy report and the conclusions offered by Dr. Rogowski, the chief pathologist who was in charge of the autopsy of Mr. Greeley. Dr. Rogowski, unequivocally, concluded: "the decedent had no significant pre-existing heart condition or disease" and that "occlusive arteriosclerotic cardiovascular disease of the degree found at autopsy would be insufficient to justifiably explain the demise." This court, therefore, concludes that the determination of BJA officials to base their decision to deny this decedent death benefits under the PSOBA on a conclusion that Mr. Greeley died of a pre-existing heart condition is unfounded and is not supported by the record in the case. The BJA officials acted arbitrarily and capriciously when they ignored the clear evidence in the autopsy report that a pre-existing heart condition was not present and did not cause this firefighter's death.

The plaintiff in any lawsuit may prove his or her case by direct or circumstantial evidence. *United States Postal Serv. Bd. of Govs. v. Aikens,* 460 U.S. 711, 714 n. 3, 103 S.Ct. 1478, 1481 n. 3, 75 L.Ed.2d 403 (1983); *Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1184 (2nd Cir.1992) (citations omitted). It is "beyond any doubt that circumstantial evidence alone may suffice to prove adjudicative facts." *Tyler v. Bethlehem Steel Corp.,* 958 F.2d at 1184 (citing *O'Brien v. National Gypsum Co.,* 944 F.2d 69, 72 (2nd Cir.1991)); *see also United States Postal Serv. Bd. of Govs. v. Aikens,* 460 U.S. at 714 n. 3, 103 S.Ct. at 1481 n. 3. Furthermore, circumstantial evidence, if relied upon by a fact finder, is of no lesser probative value than direct evidence. *United States v. Casamento,* 887 F.2d 1141, 1156 (2d Cir. 1989), *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990); *see* John W. Strong, *McCormick on Evidence* § 185, at 777 n. 19 (4th ed. 1992); John Henry Wig-

more, *Evidence in Trials at Common Law,* § 26, at 957–64 (Tillers rev. 1983).

It is uncontested that Chief Greeley died in the line of duty as the result of his participation in efforts to extinguish a fire. Furthermore, the autopsy conducted and reported by Dr. Rogowski, together with Dr. Rogowski's subsequent 1992 review of the contemporaneous autopsy report, and as reinforced by Dr. Kender's review and Dr. Lewis' report, all rule out a pre-existing heart condition, or any other pre-existing medical condition, as the cause of death.

Dr. Kender's analysis of the findings in the autopsy report appears to be the most complete. Dr. Kender based the opinions included in his report, dated November 15, 1991, on his review of Southern Chester County Medical Center records dated November 19, 1988, the report of the autopsy performed on November 21, 1988, a toxicology report dated December 10, 1988, a copy of Mr. Greeley's death certificate, and statements of Barry Smith and Larry Hood. Dr. Kender includes the following findings in his report:

... the autopsy findings indisputably prove that Mr. Greeley had no significant pre-existing heart disease. The gross and microscopic anatomic findings of the condition of Mr. Greeley's heart at the time of autopsy were 'rare focal myocardial fibrosis' (which has no clinical significance as it is a common incidental finding on autopsy), 'very few, slightly raised, yellowish, atherosclerotic plagues' [sic] (which are also of no clinical significance, as the minor degree of arterial narrowing caused by these plagues [sic] does not cause any compromise in blood flow, and likewise is an incidental and common finding on autopsy), and 'no evidence of thrombosis nor occlusion' of the coronary arteries. In other words, Mr. Greeley had no significant pre-existing heart disease, and he did not die of myocardial infarction, or 'heart attack.'

Furthermore, because there was no thrombosis or occlusion of the coronary arteries and no focal myocardial ischemia, a coronary artery spasm could not have caused Mr. Greeley's death. Finally, it is necessary to emphasize that unlike a clinical diagnosis, an anatomic finding on an autopsy is not an interpretation, but plain scientific fact.

Based on a combination of clinical and circumstantial evidence, Dr. Kender's report and Dr. Lewis' analysis offer a rational and plausible explanation for the cause of the patient's death as resulting from exposure to the smoky fire. Dr. Kender also provides a credible explanation as to why Mr. Greeley showed no signs in his blood of carbon monoxide because of the pure oxygen therapy he had received while efforts were being made to revive him. Dr. Kender wrote:

What was the ultimate cause of this arrhythmia? Since Lawrence Greeley did not suffer a myocardial infarction, and had no intrinsic heart disease, an external force, namely the smoky environment that Chief Greeley was exposed to, caused his lethal arrhythmia. A burning motor in a closed, smoke filled room creates a low oxygen, high carbon monoxide atmosphere. Such an air mixture, when breathed in for even a short period of time, can cause a critically low level of oxygen delivery to the heart. When the heart is deprived of oxygen, chest pressure will often ensue, and ultimately an arrhythmia can occur. Specifically, because carbon monoxide has an affinity for Hemoglobin that is many times that of oxygen, carbon monoxide poisons the blood very rapidly, continues to do so after exposure to carbon monoxide ceases, and can poison the blood even if small amounts are inhaled around the margins of an imperfectly fitting face mask that is attached to an air pack providing only twenty-one percent oxygen.

Crucial to the validity of this explanation is the fact that carbon monoxide poisoning in this case is not ruled out by the arterial blood gas results, which detected no carbon monoxide. The treatment of carbon monoxide poisoning is ventilation with one hundred percent oxygen, which was rapidly and effectively provided in large quantities during resuscitation. One hundred percent oxygen displaces carbon monoxide from hemoglobin, which in turn allows this poisonous gas to be cleared from the blood through the lungs. As documented in the emergency room record, the blood from

which the blood gas measurements were obtained was drawn at least fifteen minutes after Mr. Greeley entered the emergency room. Resuscitation with one hundred percent oxygen started before his arrival in the emergency room. Therefore, the period between when resuscitation began and when blood was drawn was more than enough time to clear all of the carbon monoxide out of the system. Unfortunately, this was not enough to reverse the 'diffuse visceral congestion' of Mr. Greeley's heart (as documented on autopsy) that was inflicted by oxygen deprivation.

Thus, after an exhaustive review of the record in the above-captioned case, this court finds that the decision of the BJA was not based on substantial evidence and, therefore, was incorrect, particularly in light of the command of 28 C.F.R. § 32.4 that the Bureau resolve "any reasonable doubt arising from the circumstances of the officer's death in favor of payment of the death benefits." 28 C.F.R. § 32.4. Having ruled out other possible pre-existing clinical causes, including pre-existing heart disease, it is reasonable to conclude that Chief Greeley's death was caused by climatic conditions which resulted from the smoky fire he was helping to extinguish. Moreover, it is also reasonable to conclude that the absence of carbon monoxide in Chief Greeley's blood gas drawn at the hospital was the result of any such traces having been flushed from Mr. Greeley's system by the pure oxygen therapy he had recently received.

The above-captioned case is one in which the court should confine itself to review of the record. Therefore, no further proceedings are indicated. Moreover, the papers filed with the court on defendant's motion for summary judgment reveal no material facts in dispute in this case. Based on the record, the facts the applicable statutory and regulatory provisions and the relevant case law, the plaintiff must be given the benefit of the reasonable doubt in her favor, pursuant to 28 C.F.R. § 32.4, that Chief Greeley died as a result of exposure to the smoky environment at the scene of his firefighting activities. Thus, plaintiff should be awarded widow's benefits under the PSOBA. Therefore, the court, hereby, **DENIES** defendant's motion for summary judgment, and **GRANTS** summary judgment in favor of the plaintiff, Alma E. Greeley.

The Clerk of the Court is, hereby, ordered to enter judgment in the amount of $100,-000.00, in favor of the plaintiff.

**IT IS SO ORDERED.**